UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | No. 15 CR 485–9 |
| v. | | |
| JOSÉ ANTONIO MIRELES, JR.,<br>also known as "Choi" | | Judge Virginia M. Kendall |

**GOVERNMENT'S REVISED MOTIONS TO INTRODUCE CERTAIN EVIDENCE**
**UNDER FEDERAL RULES OF EVIDENCE 404(b) AND 801(d)(2)(E)**

## **Table of Contents**

Introduction ....................................................................................... 4

Background ........................................................................................ 6

Argument .......................................................................................... 9

I.     Admission of Coconspirator Statements under Rule 801(d)(2)(E) .................. 9

    A.    Introduction ........................................................................... 9

    B.    Governing Law ..................................................................... 10

        1.    Existence of and Membership in the Conspiracy ..................... 11

        2.    "In Furtherance of" the Conspiracy .................................... 15

        3.    Alternative Bases for Admissibility of Statements ................... 17

            a.    A Defendant's Own Statements ...................................... 17

            b.    Non-Hearsay Statements ................................................ 18

            c.    Statements Against Penal Interest .................................. 19

    C.    The Evidence Demonstrating the Existence of the Charged Conspiracy and Defendants' Participation in the Conspiracy ............................................ 20

        1.    Cooperating Witness Testimony ................................... 22

            a.    Edgar Roque ................................................................. 22

            b.    Donald Williams .......................................................... 27

        2.    Amtrak Records ....................................................... 32

        3.    Specific Crimes Committed in Furtherance of the Conspiracy ...................................................... 33

        4.    Coconspirator Statements Obtained via Execution of Search Warrants and Title III Wiretaps ....................... 38

            a.    Communications with Steven Mendoza on October 7, 2015 ........................................................ 38

            b.    Communications on December 13, 2015 ......................... 40

|   | c. | Communications on March 2, 2016 ................................. 41 |
|   | d. | Communications on March 16, 2016, between Edgar and Richard Roque................................... 42 |
|   | e. | Conversations with Calvin Avendano in April and May 2016, and Edgar's Trip to Meet Avendano in Culiacán, Mexico .......................... 43 |
|   | f. | Communications on July 15, 2016 ....................... 57 |
|   | g. | Communications on August 7, 2016.............................. 57 |

|   | 5. | Border-Crossing Records..................................... 59 |
|   | 6. | Bank Records ..................................... 60 |
| D. | | Coconspirator Statements.................................... 61 |
| II. | | Admission of Evidence under Rule 404(b) ..................... 63 |
| A. | | Evidence the Government Seeks to Admit........................... 64 |
|   | 1. | Tax Records........................................ 64 |
|   | 2. | Mireles's Flight ...................................... 64 |
| B. | | The Rules of Evidence Permit Admission of Mireles's Acts ................. 65 |
|   | 1. | Failure to File Tax Returns........................................ 66 |
|   | 2. | Flight......................................................... 68 |
| III. | | Conclusion ................................................ 69 |

The UNITED STATES OF AMERICA, through JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully moves this Court to admit certain statements against defendant José Antonio Mireles, Jr., pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), as well as per *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). The government further seeks permission to admit certain evidence under Rule 404(b).

The only difference between this filing and the government's original *Santiago* proffer and motion to admit certain evidence under Rule 404(b), filed on July 8, 2019 (R. 698) is that Section I.C. ("The Evidence Demonstrating the Existence of the Charged Conspiracy and Defendants' Participation in the Conspiracy") and other relevant portions of the memo have been adjusted to reflect that the government now intends to call Edgar Roque as a cooperating witness at trial in place of Jesus Valencia.

On July 25, 2019, this Court accepted the government's initial *Santiago* proffer as sufficient for purposes of Rule 801(d)(2)(E). Exhibit A, 11-12. The Court also ruled that evidence of defendant's failure to file tax returns and the evidence of his flight were properly admissible under Rule 404(b)(2). *Id.* at 17-18, 22-28.

In support of its revised motion, the government states as follows:

## Introduction

Defendant José Antonio Mireles, Jr., conspired with, among others, Edgar Roque, Richard Roque, Jesus Valencia, Donald Williams, Phillip Diaz, Ivan Diaz, Jorge Luis Ochoa-Canela, Omar Ramirez, Steven G. Mendoza, Gerardo Sanchez, Angelica Cervantes, Juan Cervantes, Martell Jackson, Julio Andrade, Manuel

Aragon Contreras, José Davila, and Anthony Hermosillo, to distribute wholesale quantities of cocaine and heroin in the Chicago area. These narcotics were obtained from cartel members operating in Mexico and frequently shipped from Los Angeles to Chicago via Amtrak's freight service, Amtrak Express.

During the government's investigation, the government obtained court authorization to wiretap various cellular telephones, BlackBerry Messenger accounts, and Instagram accounts. The government also searched—per court-authorized search warrants—numerous cellular telephones as well as more than ten separate Instagram accounts for evidence of this drug-trafficking operation. Among the accounts searched was Mireles's account, assigned account name "oohkillem420k." During communications obtained through these wiretaps and warrants, Mireles and his co-conspirators spoke about narcotics, traveling to meet with cartel members, and firearms.

This motion summarizes the evidence supporting the admission of coconspirators' statements against Mireles and the bases for their admissibility pursuant to Rule 801(d)(2)(E). The government further requests a pretrial ruling of admissibility from the Court, in accordance with *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978) and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

Additionally, the government seeks permission to introduce under Rule 404(b) evidence of Mireles's escape from law enforcement at the time of his arrest in

October 2016 as well as of Mireles's failure to file tax returns at relevant times. Regarding Mireles's escape, DEA agents and other officers arrested Mireles in the morning of October 25, 2016 in the Los Angeles area. Law enforcement officer placed Mireles in handcuffs, seated him in the backseat of a vehicle, and began to transport him to DEA's offices. While on the way, Mireles managed to open the backseat door to the vehicle, after which he jumped out of the vehicle, ran across moving traffic, entered another vehicle parked on the side of the road, and fled. He remained a fugitive for over a year until he was arrested in May 2018. Given the circumstances, Mireles's escape helps to prove he knew that he was guilty of having committed drug-trafficking crimes and did not want to go to prison for his conduct.

Meanwhile, Mireles's failure to file taxes helps to prove that he knowingly helped to funnel drug proceeds through at least one bank account in his name and that he controlled. According to bank records, Mireles had an account ending in 2095 at Bank of America. Records further show numerous cash deposits and cash withdrawals flowing through that account between December 2014 and June 2015. That Mireles failed to file tax returns suggests that he did not want the government to learn that the true source of these funds was drug dealing.

## Background

The drug-trafficking and money-laundering organization charged in this case was formed no later than in or around 2010. Mireles joined the conspiracy by no later than November 2013. The leader of the organization, Edgar Roque, directed numerous others to package narcotics in Los Angeles and ship them to the Chicago area and elsewhere.

6

Edgar Roque knew customers in the Chicago area who purchased wholesale quantities of cocaine. One of the customers in Chicago was Martell Jackson, who was known as "Li'l Pimp." The primary method that the organization used to transport narcotics was through Amtrak Express, Amtrak's package shipping service. Between 2013 and 2015 alone, the conspirators shipped over 150 separate packages containing narcotics via Amtrak Express from Los Angeles to Chicago. At a minimum, each package contained approximately three kilograms of cocaine, and frequently, the packages contained larger quantities of cocaine and kilogram quantities of heroin.

Edgar Roque also had a number of individuals who worked for him to help with the shipment of narcotics from the Los Angeles area to Chicago. Early in the conspiracy, Julio Andrade, Jesus Valencia, Manuel Contreras, and others were responsible for packaging the narcotics into boxes in Los Angeles, shipping the packages, and picking up the packages once they arrived in the Chicago area. Edgar Roque's Chicago-based customer Martell Jackson also assisted with picking up packages in Chicago and delivering those narcotics to other customers. At other times later in the conspiracy, Mireles, along with Angelica Cervantes, Juan Cervantes, Gerardo Sanchez, Jorge Ochoa-Canela, Steven Mendoza, Omar Ramirez, Ivan Diaz, Phillip Diaz, and others also picked up narcotics packages, operated multiple stash houses in the Chicago area, delivered narcotics to customers in Chicago and elsewhere, and picked up narcotics proceeds to be returned back to Los Angeles and Mexico.

The members of the conspiracy operated a number of stash houses in the Chicago area. One was located at 5322 S. Mozart Street in Chicago, and during the conspiracy, individuals including Mireles, Valencia, Contreras, Gerardo Sanchez, and Phillip Diaz worked there to store and move narcotics and drug proceeds or otherwise brought narcotics and proceeds there. Later, Phillip Diaz rented an apartment located at 33 Adams Court in Streamwood, Illinois, for the conspirators to use to store narcotics and drug proceeds. In June 2015, Ivan Diaz retrieved a number of narcotics packages from Amtrak's facilities in Chicago and brought them to the Streamwood stash house. That same month, Ivan Diaz met at the Streamwood stash house with Mireles and Edgar Roque. At that time, the stash house contained approximately $96,000 in narcotics proceeds (proceeds from the sale of more than three kilograms of cocaine), multiple drug ledgers, and approximately 25 empty boxes that had previously contained narcotics and shipped on Amtrak.

The conspirators delivered narcotics to customers outside of the Chicago area. For instance, on March 16, 2016, Edgar Roque had Instagram Direct communications with, among others, Mireles, Richard Roque, Phillip Diaz, and Ochoa Canela. During the communications, Richard asked if "Ajax [was] off" and asked what Edgar meant by that he "took the ones they where [were] in their [there]." Edgar responded that he "took like 2 points" and asked, "Why, what they told u?" Edgar also said that he weighed it, and it was "28.2," which the government will show meant that Edgar weighed ounce-quantities of narcotics. Richard asked if Edgar "took the two bags," and Edgar responded that only one was there. Richard said, "[T]here were 3," to which

Edgar replied, "I only took 1." This conversation appears to be a discussion between Edgar and Richard about ounce quantities of narcotics that Edgar took from a particular location.

In May 2016, Edgar Roque traveled to Culiacán, Mexico, to meet with his drug supplier. Edgar had numerous intercepted communications with the supplier about the planned meeting and future narcotics transactions. Edgar separately had intercepted communications with Mireles, Phillip Diaz, Ochoa Canela, and Richard Roque about the trip. For instance, on May 9, 2016, Edgar had Instagram Direct communications with Mireles, Phillip Diaz, Ochoa Canela, Richard Roque, and others. Edgar said, "I need a ride to tj [Tijuana]. . . . I need a ride." Edgar's brother, Individual A, eventually wrote, "Take him tee [Ochoa-Canela's nickname]." Records further show that Edgar did indeed meet with his drug supplier on May 12 and 13.

## Argument

## I. Admission of Coconspirator Statements under Rule 801(d)(2)(E)

### A. Introduction

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978), and established practice in this Circuit. *E.g.*, *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016); *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would show the existence of the drug-trafficking conspiracy or all of the coconspirator statements that were made in furtherance of the charged drug-trafficking and money-laundering conspiracy. Rather, this submission highlights certain of the government's evidence sufficient to establish the existence of the conspiracy described in Counts One and Seven of the Fourth Superseding Indictment and the participation of the coconspirators. R. 293. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## B. Governing Law

Under Federal Rule of Evidence 801(d), a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the defendant and the declarant were members of the conspiracy; and (iii) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

---

[1] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823–24 (2006), and *Crawford v. Washington*, 541 U.S. 36 (2004));

### 1. Existence of and Membership in the Conspiracy

Per *United States v. Santiago*, this Court must make a preliminary determination about whether statements by the defendants' coconspirators will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide whether "the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Santiago*, 582 F.2d at 1134 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Before the government can introduce coconspirator statements at trial, the government first must make a preliminary offer of evidence to show: (i) that a conspiracy existed; (ii) that the defendants and declarant were members of the conspiracy; and (iii) that the statements sought to be admitted were made during and in furtherance of the conspiracy. *E.g.*, *Davis*, 845 F.3d at 286; *Alviar*, 573 F.3d at 540; *Santiago*, 582 F.2d at 1134-35. The government bears the burden to make this showing by a preponderance of the evidence. *Davis*, 845 F.3d at 288. The court can consider the contents of the statements themselves in deciding whether to admit the statements under Rule 801(d)(1)(E). *Bourjaily v. United States*, 483 U.S. 171, 176-81

---

*see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

(1987); *Davis*, 845 F.3d at 286. Seventh Circuit cases construing *Bourjaily* also have held that properly admitted hearsay may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *see Davis*, 845 F.3d at 286, the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation in it. The government also must introduce some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Id.*; *Harris*, 585 F.3d at 398–99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

---

[2]    The coconspirator-statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565–66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal*

The government is not required under Rule 801(d)(2)(E) to establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548–50 (7th Cir. 1979). The government only needs to prove the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549–50; *see also Coe*, 718 F.2d at 835.

In these ways, a distinction exists between conspiracy law and admissibility under Rule 801(d)(2)(E). Nevertheless, certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). Additionally, the government does not need to prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir.

---

*Wyk*, 840 F.2d 494, 497–98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867–69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; whether the defendant knows, has met, or has agreed with every coconspirator are not material considerations. *Longstreet*, 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant or other declarant may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) (holding that "it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove—from the statement, the context, or other evidence—that the declarant was in fact a coconspirator. *Id*.

14

## 2. "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2–3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- To conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000)[3];

- To recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937–38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- To identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

- To plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- As an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073–74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890–91 (7th Cir. 2007);

- To inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- To control damage to an ongoing conspiracy, *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989); *Van Daal Wyk*, 840 F.2d at 499;

- To conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928–29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- To reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- To report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- "[D]escribing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

---

[3] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

16

- Statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

Finally, any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937). Indeed, whether or not "any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility." *United States v. Rivera*, 136 F. App'x 925, 926 (7th Cir. 2005).

### 3. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

### a. A Defendant's Own Statements

A defendant's own admissions are admissible against him without reliance on the coconspirator-statement rule. Fed. R. Evid. 801(d)(2)(A); *see also United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). According to Rule 801(d)(2)(A), a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The court of appeals

held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id*. at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements"). Likewise, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999).

Finally, a defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him. *United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371–72 (7th Cir. 1987).

### b.    Non-Hearsay Statements

The coconspirator statement rule is not implicated when the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. For example, orders and suggestions are not hearsay statements. *See Tuchow*, 768 F.2d at 868 n.18. This is because a "statement" is defined as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

The coconspirator statement rule likewise does not apply when a statement is not being offered for the truth of the matter asserted; in such circumstances, the statement does not constitute "hearsay" as defined by Rule 801(c).[4] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929–30; *see also Herrera-Medina*, 853 F.2d at 565–66; *Van Daal Wyk*, 840 F.2d at 497–98; *Tuchow*, 768 F.2d at 867–69.

### c.  Statements against Penal Interest

Under Rule 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *E.g.*, *United States v. Ferrell*, 816 F.3d 433, 439 (7th Cir. 2015); *United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995).

---

[4]  According to Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements defendants made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g.*, *United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two co-defendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming admission of a co-defendant's inculpatory statement that also incriminated the defendant in it because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Watson*, 525 F.3d 583, 587–88 (7th Cir. 2008); *Hamilton*, 19 F.3d at 356; *see also United States v. Smalls*, 605 F.3d 765, 773–81 (10th Cir. 2010).[5]

### C. The Evidence Demonstrating the Existence of the Charged Conspiracy and Defendants' Participation in the Conspiracy

At trial, the government plans to introduce evidence to establish that Mireles conspired with Edgar Roque, Richard Roque, Phillip Diaz, Manuel Aragon Contreras, Julio Andrade, Anthony Hermosillo, Angelica Cervantes, Juan Cervantes, Ivan Diaz, Martell Jackson, Steven Mendoza, Jorge Ochoa-Canela, Omar Ramirez, Gerardo

---

[5]     This does not create a Confrontation Clause problem since "[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes." *Watson*, 525 F.3d at 589.

Sanchez, Jesus Valencia, and others to operate a drug-trafficking organization. The evidence will show that, among other activities, this organization: (i) obtained wholesale quantities of narcotics from various suppliers, including those based in Mexico; (ii) transported these narcotics to downstream customers based in the Chicago area; (iii) transported a substantial portion of these narcotics via Amtrak Express; (iv) operated stash houses in the Chicago area for gathering and redistributing the narcotics transported via Amtrak to Chicago and for organizing drug proceeds for delivery back to California and elsewhere; and (v) laundered hundreds of thousands of dollars of drug proceeds from coconspirator bank accounts.

As set forth below, the evidence that establishes the existence of this drug-trafficking conspiracy meets the preponderance-of-the-evidence standard applicable at this stage of the proceedings. Some of the evidence that the government will present at trial regarding the existence of the charged conspiracy is below.

To establish the existence of the conspiracy charged in Count One of the Fourth Superseding Indictment, the government intends to introduce at least the following evidence at trial: (i) testimony from cooperating individuals regarding their personal knowledge of the conspiracy and firsthand experience with Mireles's and co-conspirators' criminal activities; (ii) statements by Mireles as well as coconspirators' statements during conversations intercepted pursuant to authorized Title III wiretaps of telephones, Instagram accounts, and BlackBerry Messenger devices; (iii) Mireles's and coconspirators' statements obtained via search warrants executed

on Instagram accounts; (iv) photographs of the coconspirators; (v) Amtrak, bank, and travel records; and (vi) flight and border-crossing records.

### 1. Cooperating Witness Testimony

At trial, the government anticipates calling Edgar Roque, Donald Williams, and possibly other cooperating witnesses.

### a. Edgar Roque

The government anticipates Edgar Roque will testify that he began selling small quantities of narcotics when he was in the 7th or 8th grade. Years later, Roque began working with a wholesale narcotics supplier (Individual A) in the Los Angeles area with a direct connection to the highest levels of the Sinaloa Cartel. Cartel suppliers in Mexico sent Roque and Individual A semitruck shipments of cocaine to Los Angeles. Each shipment had kilogram quantities of cocaine hidden inside the tires. Roque and Individual A sold the cocaine to customers in the Los Angeles area, and arranged to ship the cocaine from Los Angeles to customers in Chicago via concealed semitruck shipments. Roque would then fly to Chicago to assist with the cocaine distribution and to receive the narcotics proceeds, which he then carried back to Los Angeles.

In or around 2008, Roque approached a family friend, Individual B, who worked at Amtrak in Los Angeles to see if it would be possible to ship narcotics from Los Angeles to Chicago via Amtrak Express. Roque told Individual B the boxes would contain marijuana as opposed to cocaine or heroin because he did not want to tempt Individual B to steal. In exchange for $500 per box, Individual B agreed to make sure boxes filled with narcotics safely got onto Amtrak trains headed to Chicago.

Between approximately 2008 and 2015, Roque regularly (*i.e.* several times per month) sent boxes full of cocaine and heroin from Los Angeles to Chicago via Amtrak Express. Each box typically contained at least 20 kilograms of cocaine. During this period, Roque had a crew of individuals helping him with his drug distribution. The crew included Richard Roque, Omar Ramirez, Manuel Aragon-Contreras, Julio Andrade, Steven Mendoza, Juan Cervantes, Angelica Cervantes, Ivan Diaz, Phillip Diaz, Gerardo Sanchez, Jesus Valencia, and defendant. Roque paid his crew members to travel to Chicago to receive incoming Amtrak express drug shipments, distribute the drugs to customers in and around Chicago, collect the proceeds of the drug sales, and arrange for the proceeds to be transferred to Los Angeles, either via physical smuggling or by making structured deposits and withdrawals in various "funnel" bank accounts used by the co-conspirators.

Between 2008 and 2015, Roque had multiple different drug suppliers who supplied him with the cocaine and heroin that he shipped to Chicago. Roque also had multiple drug customers in and around Chicago, including Lamont Jackson and Martell Jackson, knowns as "Pimp" and "Little Pimp," respectively. Roque and his crew members maintained several different stash houses in Chicago, including a house on Mozart St., an apartment at the "River City" complex at 800 S. Wells, a house near the corner of Archer Avenue and Pulaski Road in Chicago, and a house in Streamwood, Illinois. The stash houses were used to store the narcotics received on Amtrak Express as well as drug proceeds received from customers.

In or around 2012 or 2013, Aragon-Contreras developed his own narcotics supplier and he broke away from Roque to form his own drug distribution crew. Aragon-Contreras began regularly supplying Donald Williams with cocaine and heroin sent from Los Angeles to Chicago via FedEx shipments. Aragon-Contreras and his crew overlapped with Roque's crew in several ways. For example, Roque occasionally supplied Aragon-Contreras's crew with narcotics, and the two crews frequently used the same stash houses in Chicago and the same "funnel" bank accounts to launder drug proceeds. Further, Roque started supplying Donald Williams with narcotics in or around 2015 after Aragon-Contreras's crew suffered a series of law enforcement seizures of drug-laden FedEx packages.

With respect to Mireles specifically, the government anticipates that Roque's testimony will include the following:

- Roque and Mireles grew up in the same neighborhood in the Los Angeles area and attended the same high school. Several years after high school, they began regularly hanging out. Roque called Mireles "Cho."

- In or around late 2013 or early 2014, Mireles joined Roque's drug trafficking conspiracy. Specifically, Mireles agreed to begin regularly traveling to Chicago to receive narcotics-laden packages shipped via Amtrak Express, to distribute the narcotics to customers in and around Chicago, to collect drug proceeds from the customers, and to launder the drug proceeds through funnel bank accounts, including accounts that Mireles opened in his own name at Roque's instruction.

- Roque originally told Mireles that the narcotics-laden packages shipped to Chicago contained only marijuana. Roque did this so as not to alarm Mireles. However, Mireles soon learned that the packages contained cocaine and heroin. On at least two occasions, Roque observed Mireles physically handling kilogram quantities of cocaine in Chicago. On several other occasions, Roque and other co-conspirators discussed in Mireles's presence the fact that they were trafficking cocaine and heroin.

24

- On several occasions when Roque was in Los Angeles and Mireles was in Chicago, Roque spoke to Mireles by telephone and directed him to pick up incoming narcotics-laden packages at Amtrak. Roque also had several telephone conversations with Mireles in which Mireles confirmed that he had received the packages and brought them to one of the Chicago stash houses. During several of those conversations, Mireles confirmed with Roque the number of kilograms of narcotics contained inside the package. In some of these same or other conversations, Roque directed Mireles to distribute specific quantities of the narcotics to specific customers in the Chicago area. Mireles would later call Roque to confirm that he had delivered or was in the process of delivering the narcotics. Roque paid Mireles and other couriers approximately $200-$400 per kilogram of narcotics that they delivered to drug customers.

- In or around late 2014, law enforcement seized approximately $1.2 million in drug proceeds that Roque and Manuel Aragon Contreras were shipping from Chicago to Los Angeles in a semi-truck. The driver of the truck was called "Batecas." In or around late 2014, Roque, Mireles, and Batecas traveled to Mexicali to meet with Roque's drug supplier, to whom most of the seized $1.2 million was owed. During the meeting, Roque's supplier's men pointed guns at Roque, Mireles, and Batecas and demanded an explanation for the seizure. In Mireles's presence, Roque described certain events leading up to the seizure, including the loss of 20 kilograms of heroin. In Roque and Mireles's presence, Roque's supplier's men started beating Batecas and threatened to kill him. Ultimately, Roque and Mireles were released but Batecas was held for a $350,000 ransom. Roque intentionally brought Mireles down to Mexico to witness this event so Mireles would understand the consequences of "messing up" in the drug business.

- At the beginning of Mireles's involvement in the conspiracy, Roque directed Mireles to open two "funnel" bank accounts in his name to use for purposes of laundering drug proceeds. Roque instructed Mireles that all deposits and withdrawals into the accounts had to be kept under $10,000 for purposes of avoiding scrutiny by law enforcement. When Mireles traveled to Chicago for purposes of the drug conspiracy, Roque regularly directed Mireles and other crew members to receive large quantities of drug proceeds and break them up into multiple separate deposits of under $10,000 into funnel bank accounts, including the accounts in Mireles's name. On several occasions when Mireles was in Los Angeles, Roque directed Mireles to make structured withdrawals of narcotics proceeds from Mireles's funnel bank accounts and deliver the cash proceeds to Roque, Aragon-Contreras, or others, and Mireles did so. Roque paid Mireles $100-$200 for each structured deposit he made.

- The co-conspirators regularly communicated with one another via telephone and Instagram. Roque used Instagram account "eggy_ng". Mireles used Instagram account "oohkillem420k".

- During Mireles's involvement in the conspiracy, Roque asked Mireles to try to purchase a Glock 19 Generation 4 firearm for Roque to send to his drug suppliers in Mexico. Mireles had a contact who sold firearms. Mireles tried to obtain the Glock 19 for Roque but was unsuccessful.

- On several occasions in or around the spring or summer of 2015, Roque directed Mireles to deliver cocaine to, and collect narcotics proceeds from, Donald Williams and Donald Williams's workers in Chicago. At that time, Aragon-Contreras's crew was unable to supply Williams because they had recently suffered a series of seizures by law enforcement.

- In or around June 2015, Roque directed Mireles to travel to Chicago to meet with Roque and Ivan Diaz to conduct activity related to the drug conspiracy. Shortly before Mireles's arrival, Ivan Diaz received an incoming cocaine shipment on Amtrak Express and took it to a new stash house in Streamwood, Illinois. The morning after Mireles arrived, Roque, in Mireles's presence, instructed Ivan Diaz to deliver 40 kilograms of cocaine (which were at the Streamwood stash house) to drug customers in Mendota, Illinois. Diaz made the delivery while Roque and Mireles remained at the stash house. When Diaz returned, Roque, in Mireles's presence, paid Diaz $16,000 for making the delivery. Later the same day, Roque, Diaz, Mireles decided to go buy new burner phones to use in furtherance of the conspiracy. Before they left, Diaz and Mireles hid 10 kilograms of cocaine inside air vents in the floor in one of the stash house's bedrooms. They also hid a large quantity of cash narcotics proceeds inside the stash house. While Roque, Mireles, and Diaz were on their way to purchase phones, they were stopped by law enforcement and briefly detained. While detained, law enforcement told Roque that they had searched the Streamwood stash house and recovered a large quantity of cash. Roque was surprised that law enforcement did not mention the 10 kilograms of cocaine and suspected they had missed it.

- Shortly after Roque, Mireles, and Diaz were released from custody, they got a hotel room together. Roque, Mireles, and Diaz then discussed how they were going to return to the stash house to check on the 10 kilograms of cocaine (they suspected law enforcement was laying a trap for them). Roque called multiple people in Los Angeles to see if they would fly to

Chicago and go to the Streamwood stash house to see if the 10 kilograms were still there. Steven Mendoza agreed to do so. When Mendoza arrived in Chicago, Roque, Mireles, Diaz, and Mendoza drove to the Streamwood stash house. Roque explained to Mendoza (in Mireles and Diaz's presence) where to find the drugs in the stash house. Mendoza then went inside while Roque, Mireles, and Diaz waited outside. Minutes later, Mendoza returned and confirmed the 10 kilograms of cocaine were still in the air vents in the bedroom floor, where Mireles and Diaz had hidden them. Roque, Mireles, Diaz, and Mendoza decided to return to the stash house in the middle of the night to retrieve the cocaine.

- At approximately 3 a.m. the next night, Roque, Mireles, Diaz, and Mendoza returned to the Streamwood stash house (Roque, Mireles, and Diaz drove in one car, and Mendoza drove in another). Mendoza went inside the house and retried the cocaine. Roque had previously contacted Aragon-Contreras to see if he had a customer who could buy the 10 kilograms so Roque could get rid of them quickly, and Aragon Contreras arranged for Donald Williams to purchase the cocaine. After Mendoza retried the cocaine, Roque, Mireles, Diaz, and Mendoza delivered the drugs to female workers of Donald Williams.

- The Streamwood incident was the last time that Mireles was involved in drug dealing with Roque. Shortly after the Streamwood incident, Roque went to Mexico until things cooled off with law enforcement. Roque tried to convince Mireles to come to Mexico and wait things out with him but Mireles refused.

### b. Donald Williams

Donald Williams was prosecuted in case number 15 CR 504. The government anticipates that Williams will testify that he met and worked with a group of individuals based in the Los Angeles area who regularly shipped large quantities of cocaine and heroin to Chicago, received and distributed the drugs in the Chicago area, and laundered the proceeds of their drug sales from Chicago back to Los Angeles. According to Williams, these individuals included (among others) José Mireles (whom Williams only knew as "Choi"), Edgar Roque (whom Williams knew as "Jesse," "E," and "Eggy"), Richard Roque (whom Williams knew as "Traps"), Jorge Ochoa-Canela

(whom Williams knew as "G"), Jesus Valencia (whom Williams only knew as "K" and knew was Julio Andrade's cousin, which is true), Omar Ramirez (whom Williams only knew as "Cecil"), Phillip Diaz (whom Williams also knew as "PH" and knew was Edgar's brother-in-law, which is true), Gerardo Sanchez (whom Williams knew only as "Morrow"), and Ivan Diaz (whom he knew only as "Tec"). Williams also identified a photo of Angelica Cervantes as someone involved in this scheme who was Valencia's cousin (which is true). And Williams identified a photo of Martell Jackson, whom Williams knew as "Little Pimp." Based on his interactions with Edgar and his workers, Williams learned that Richard and others invested in the drugs that Edgar's crew shipped to Chicago and helped manage the lower-level workers in the crew. The workers included José Mireles, Omar Ramirez, Gerardo Sanchez, Phillip Diaz, and Ivan Diaz.

According to Williams, he was a drug dealer in Chicago and that after getting out of prison, he met Manuel Contreras at a party in Los Angeles. They exchanged phone numbers and for the next few months, got to know each other socially. In 2012 or early 2013, Williams brokered several drug deals between Contreras and individuals in Chicago, Champagne, and St. Louis. During that time, Contreras and his associates maintained a stash house on Mozart Avenue in Chicago; Williams identified a photo of the Mozart stash house as the location used by Contreras as a stash house. Contreras told Williams that "all narcotics at the Mozart house belonged to Jesse [meaning Edgar], and all the workers at the Mozart house worked under [Edgar]." Williams regularly picked up drugs from Contreras at the Mozart stash

house, but when Contreras was not in town, Williams was supplied by Phillip Diaz, Omar Ramirez, Gerardo Sanchez, and Julio Andrade.

In the fall of 2013, Williams asked Contreras if he could start buying cocaine from Contreras directly rather than just brokering sales. Contreras told Williams that Williams needed to talk to Edgar to set this up. According to Williams, shortly after that conversation, Contreras told Williams to meet Edgar at the parking lot of a Mexican restaurant near 55th Street and Pulaski Road in Chicago. Williams met with Edgar in Edgar's car outside the restaurant. During that meeting, Williams told Edgar that he wanted to purchase a half kilogram of cocaine from Edgar. Edgar responded that he only dealt in kilogram quantities and above, so (according to Williams) the deal did not go through.

About a month later, Contreras invited Williams to go gambling with him at the Horseshoe Casino in Indiana. Williams brought along a friend to the casino who spoke Spanish. Williams met Contreras at the casino bar where Williams found him sitting and drinking with Edgar. During the conversation, Contreras told Williams that Edgar was Contreras's drug supplier. Contreras also told Williams that Edgar was "the man," which Williams understood to mean that Edgar moved large quantities of drugs. Also during the meeting, Williams observed Edgar and Contreras frequently speak to each other in Spanish. Edgar told Contreras that Contreras could start providing Williams with cocaine on credit but needed to warn Williams not to steal the cocaine. According to Williams, Contreras told Edgar that he did not yet trust Williams enough to provide Williams with cocaine on credit.

According to Williams, sometime around February 2014, Edgar, Contreras, and several of their crewmembers were back in Chicago. During this trip, Contreras told Williams that Edgar was staying at the Trump Hotel and had 15 to 20 kilograms of cocaine stored in his hotel room that he wanted to sell. According to Williams, Williams offered to sell five kilograms of the cocaine to a drug customer of Williams's in St. Louis. On the day of the planned sale, Williams met Contreras in the lobby of the Trump hotel in Chicago. Shortly after Williams arrived, Contreras came down to the lobby carrying a backpack. An individual whom Williams identified only as "Guado" accompanied Contreras. Williams testified that he, Contreras, and Guado then drove to Darien, Illinois, where they met with Williams's customer. The customer paid cash for the five kilograms.

Contreras told Williams about Edgar's drug customers in Chicago. According to Williams, Contreras told Williams that Edgar's biggest customers in Chicago were two guys called "Pimp" and "Little Pimp." Contreras also told Williams that Pimp and Little Pimp were father and son, respectively. Williams testified that he never met Pimp or Little Pimp in person but that Contreras told Williams that they were black men. Contreras also told Williams that Pimp went to prison in or around 2010 and that Little Pimp took over the business.

According to Williams, sometime in early 2014, Contreras told Williams that someone had broken into the Mozart stash house and that five kilograms of cocaine had been stolen. Williams suggested to Contreras that he and his drug partners rent an apartment in downtown Chicago because a downtown location would be more

secure than the Mozart house, and because they then could have a regular place to stay when they traveled to Chicago. Soon after, the conspirators rented an apartment at 800 S. Wells Street in Chicago (the River City apartment complex).

Williams regularly was at the River City apartment between early 2014 and early 2015. During that time, Williams regularly picked up drugs from the apartment and dropped off drug proceeds at the apartment. Williams regularly saw Edgar's workers, including Omar Ramirez, Phillip Diaz, Gerardo Sanchez, and José Mireles, go to the 800 S. Wells apartment from Union Station with boxes full of drugs that had been shipped to Chicago on Amtrak trains. On at least five different occasions, Williams observed Edgar's workers, including Omar Ramirez, Phillip Diaz, Jesus Valencia, and José Mireles, open these boxes in front of Williams. Williams saw that they were packed with multiple kilograms of drugs. He observed that each shipment typically contained up to ten kilograms of cocaine, but sometimes the shipment contained a combination of cocaine and heroin. Williams recalled having seen this most frequently during the summer of 2014.

According to Williams, in May 2015, he received five kilos of cocaine from Edgar in a pair of deliveries brokered by Contreras. Williams determined that the cocaine came from Edgar because Contreras told Williams that the cocaine was from Edgar and because Williams observed Mireles, Phillip Diaz, and Ivan Diaz deliver the drugs and pick up the money for the drugs. Williams explained that these three individuals were not involved when Williams purchased drugs from Contreras. According to Williams, Phillip Diaz and Ivan Diaz delivered the first two kilograms

to Williams in the area of 87th Street and the Dan Ryan Expressway. About a week later, Williams met with Mireles and Ivan Diaz at a parking garage in Chicago and gave them about $65,000 in cash for the first two kilograms. At this meeting with Mireles and Ivan Diaz, Mireles gave Williams three more kilograms of cocaine. In June 2015, Williams met with Mireles and possibly also Phillip Diaz at a Hooter's restaurant parking lot in downtown Chicago and gave them about $70,000 or $80,000 for the three kilograms that Williams received at the second meeting.

After that third meeting, Williams still owed Edgar about $20,000 to $25,000 for the three kilograms Williams received in May 2015. According to Williams, in late June and early July 2015, Contreras contacted Williams on several occasions to collect the debt that Williams owed Edgar. Contreras sent Williams several messages telling Williams that Julio Andrade was in town and that Williams should meet with him at Navy Pier to give him the remaining money. Williams stopped responding to Contreras's communications and did not meet with Julio Andrade because Williams did not have the money. Williams was arrested on his case shortly thereafter.

### 2. Amtrak Records

The conspiracy used Amtrak Express as the primary method of transporting the conspirators' cocaine and heroin from Los Angeles to Chicago and elsewhere. Exhibit A attached to this motion consists of a summary chart of Amtrak records showing the transportation by Amtrak of each of these packages and the members of the conspiracy who participated in obtaining each package from Amtrak's facilities at Union Station in Chicago. These records corroborate the anticipated testimony of Valencia and Williams that the conspiracy shipped narcotics packages via Amtrak

and that conspirators in Chicago routinely went to Amtrak in Chicago to pick up those packages.

The Amtrak records also corroborate witness testimony about who participated in the conspiracy. The records are a who's who of coconspirators: the records show that between 2010 and 2015, Edgar Roque, Jesus Valencia, Donald Williams, Phillip Diaz, Ivan Diaz, Omar Ramirez, Steven Mendoza, Gerardo Sanchez, Angelica Cervantes, Juan Cervantes, Martell Jackson (through his sister, Monique), Julio Andrade, Manuel Aragon Contreras, José Davila, Anthony Hermosillo, and (of course) Mireles all picked up narcotics packages at Amtrak, had those packages delivered in their names, or both. The records also show that, sometimes, multiple members of the conspiracy went to retrieve packages together. That all these individuals picked up or had delivered in their names all these packages containing wholesale quantities of narcotics is no coincidence. Just as the government anticipates the cooperating witnesses will testify, these were all knowing participants in this drug-trafficking conspiracy.

### 3. Specific Crimes Committed in Furtherance of the Conspiracy

Additionally, the government intends to introduce evidence regarding a law enforcement stop of Edgar Roque, ireless, and Ivan Diaz on June 23, 2015, in Streamwood, Illinois. This evidence will provide additional independent bases to conclude that the conspiracy as charged existed and that the statements made by the coconspirators are admissible under Rule 801(d)(1)(E).

According to Southwest Airlines records, on June 22, 2015, José Mireles flew Southwest Airlines Flight 3775, departing at 4:45 p.m. from Los Angeles and arriving at 10:40 p.m. in Chicago. Southwest Airline records further show that Phillip Diaz booked this flight for Mireles early in the morning on June 22. Law enforcement officers conducting surveillance observed Mireles get off of Flight 3775 at Midway Airport, get his luggage from the baggage claim area at the airport, and travel by taxi to the vicinity of 33 Adams Court in Streamwood, Illinois.

Prior to that trip, on or about June 2, 2015, in a separate investigation being conducted by law enforcement officers in Riverside, California, Judge Becky L. Dugan of the Superior Court of California, Riverside County, entered orders authorizing the wiretap of the telephone assigned number (562) 443-2661 as well as the monitoring of real-time GPS location information from that telephone. Based on the location information from the phone as well as law enforcement surveillance, law enforcement determined that Mireles was using and holding that telephone. Additionally, the previous year, on November 6, 2014, law enforcement officers stopped and interviewed Angelica Cervantes. During the interview, Angelica consented to a search of her phone. Law enforcement officers searched Angelica's contact list and found the (562) 443-2661 phone number stored in Angelica's phone listed under the name "Choi" (the same name that Williams used for Mireles).

The next day, law enforcement conducted surveillance at the Adams Court residence, and at approximately 12:45 p.m., surveillance agents observed Ivan Diaz drive a white Mercury sport utility vehicle plate number V415608 into the garage at

34

the Adams Court residence. This was the same vehicle that agents had observed Phillip Diaz drive to Amtrak twice on July 31, 2014. At approximately 1:20 p.m., the vehicle exited the Adams Court residence garage and drove away from the area. While on the road, the white Mercury was driven onto several dead end streets and then reversed and on multiple occasions accelerated at high rates of speed. The vehicle was driven by Ivan Diaz and law enforcement officers observed Mireles in the front passenger seat and Edgar Roque in one of the rear passenger seats.

Law enforcement stopped the vehicle. A short time later, Ivan Diaz gave consent for officers to search the Adams Court residence. During the search, officers found a Nicor Gas receipt identifying Phillip Diaz as the individual who was renting the residence. Also during the search, in the living room, officers observed a wooden television cabinet. Officers opened the cabinet and found approximately $96,000 in cash. In one of the bedrooms in the residence, officers found two Amtrak Express waybills bearing numbers CA0003531 and CA0006286 along with a black notebook that appeared to contain ledgers handwritten onto its pages. In the laundry room above an air conditioning duct, officers found a blue notebook that appeared to contain additional handwritten ledgers. On the kitchen floor, officers found Amtrak labeling stickers. In the garage, officers found approximately 25, stacked, cardboard boxes with partially torn Amtrak labels affixed to them.

Law enforcement officers also found and seized a number of phones from the Streamwood residence, and on December 11, 2015, Magistrate Judge Jeffrey Cole signed a warrant authorizing the search of those phones. The government believes

and anticipates proving at trial that one of the phones, a black, silver, and grey ZTE N800 cell phone assigned number (562) 449–6736, was used by Edgar Roque.[6] That phone contained numerous text messages from June 22, 2016, with phone number (562) 443–2661, Mireles's cell phone. Exhibit B contains the relevant text exchange between the two phones that day. During the conversation, Mireles wrote, "[M]y flight leaves at 4:45 today. I woke up late but they were able to change it to later."[7] Edgar Roque responded, "It was 910. I need u outhere. . . ." Mireles replied, "I kno i got up late." Later in the conversation, Mireles had the following exchange with Edgar:

| | |
|---|---|
| Edgar: | Check right now how much u owl the bank |
| Mireles: | 100 Bucks |
| Edgar: | U sure |
| Edgar: | Who sales heats outhere |
| Edgar: | ??? |
| Edgar: | I need a glock 19 generation 4 |
| Mireles: | Yeah i called it said i over drafted 60 plus what they charge so like 100 bucks |

---

[6] The texts were from June 22, 2015, and law enforcement only observed Edgar Roque, Ivan Diaz, and Mireles at the residence. Law enforcement separately learned that Steven Mendoza also used this residence and that the residence was rented by Phillip Diaz. The government anticipates proving that of the five individuals associated in one way or another with the residence, Edgar Roque was the one who used this phone. But, at the very least, the government will prove that the phone was used by Edgar, Ivan Diaz, Phillip Diaz, or Mendoza, meaning that Mireles had this text message conversation with one of the other coconspirators.

[7] Southwest Airlines records show that Phillip Diaz originally booked Mireles to be on Flight 1502 from Los Angeles to Midway Airport, which was scheduled to depart from Los Angeles at 9:10 a.m. and arrive in Chicago at 3:05 p.m. Flight 3775—the flight Mireles actually took—departed Los Angeles at 4:45 p.m.

| Edgar: | Ok |
| Mireles: | Bro is it cold so i can take a sweater |
| Edgar: | Not really |
| Edgar: | What up with the heat |
| Mireles: | ku |
| Mireles: | My boi dint pick up |
| Edgar: | Call him again |
| Mireles: | Ok |
| Edgar: | What did he say |
| Mireles: | Yo he said not right now |
| Edgar: | Does not have |
| Mireles: | He said there not getting any right now |

These text messages provide unambiguous proof that Mireles was speaking with Edgar (or one of the other coconspirators) about traveling to Chicago to assist the conspiracy and about the purchase of a firearm. These texts provide strong evidence of Mireles's active participation in this conspiracy—he was not simply a bystander.

Following the traffic stop of Mireles, Edgar Roque, and Ivan Diaz on June 23, and while all were still on the street, law enforcement officers asked to speak with each individual. Mireles identified himself as José Mireles. He also told the law enforcement officers that the three individuals were on their way to a casino and had just departed from a location in the city of Chicago. The agents told Mireles that they

had, in fact, observed the vehicle leave from the Adams Court residence, at which point Mireles became nervous and put his head down.[8]

### 4. Coconspirator Statements Obtained via Execution of Search Warrants and Title III Wiretaps

In 2015 and 2016, law enforcement obtained warrants to search a number Instagram accounts controlled and held by the coconspirators. This included a warrant to search Mireles's Instagram account, "oohkillem420k," signed by Magistrate Judge Cole on February 12, 2016 (warrant 16 M 90). On February 22, 2016, Chief Judge Rubén Castillo entered orders authorizing the Title III wiretap of Instagram account "eggye_ng," which was controlled by Edgar Roque. Between February 2016 and the arrests of the coconspirators in late-October 2016, law enforcement obtained numerous Title III orders to continue to intercept Instagram communications over Instagram account eggye_ng as well as over Omar Ramirez's Instagram account, two phones used by Edgar Roque, and eight different BlackBerry Messenger devices. The following posts and communications provide additional evidence of the existence of the charged conspiracy:

### a. Communications with Steven Mendoza on October 7, 2015

On October 7, 2015, Edgar and Steven Mendoza discussed a trip that Mendoza took to New York. Specifically:

---

[8] To the extent that Mireles might attempt to argue that this statement to law enforcement is an uncharged act inadmissible under Rule 404(b), Mireles would be mistaken. Mireles lied to the police for the purpose of concealing the true reason why he was with Edgar Roque and Ivan Diaz—they were conducting acts in furtherance of their narcotics operation—and the lies show Mireles knowledge and participation in the conspiracy.

Edgar: How much were the expenses when you were up there 🗽🗽🗽 [emojis of the Statue of Liberty, a symbol for New York]?

Edgar: Took

Edgar: Yooo

Mendoza: OK[.] Driving[,] I'll send it in a few

Edgar: Aight

Edgar: Yooo

Mendoza sent this image:



The image appears to be of a ledger showing money received and expenses paid. After Mendoza sent this ledger, the conversation continued:

Mendoza: Sent

Edgar: Arree

Edgar: they raised in cln [Culiacán, Mexico]

Mendoza: Nah

Edgar: How did u end up with 58

Edgar: Truth

Mendoza: They made it disappear or what

Edgar: Nahh they just kick him out of cln [Culiacán]

Edgar: my boys tied it and put it in "cachasos"

Mendoza: They were 60 from one [,] and we took 2k out for him. So it was 58k plus what "Negro" gave were 22600

Mendoza: So adding that up are 80600

Mendoza: And that's what was given

Edgar: Ok

Edgar: Cool

This conversation is evidence that Edgar Roque directed Mendoza to travel to the New York City area and collect approximately $80,600.

### b.    Communications on December 13, 2015

On December 13, 2015, Mireles, Edgar Roque, Richard Roque, Ramiro Roque, Phillip Diaz, Steven Mendoza, Jorge Luis Ochoa-Canela, and José Octavio Flores had the following group chat on Instagram Direct:

Edgar:          Wash it

Mireles:        Nahh dagg

Mendoza:



Mendoza:        A rain of bullets for all the snitches

### c.        Communications on March 2, 2016

On March 2, 2016, Edgar had a group chat over Instagram with Mireles, Richard Roque, Ochoa-Canela, and others. During the conversation, Ochoa-Canela sent the following photo:



The following communications were then sent:

| | |
|---|---|
| Edgar: | U got a glock?? |
| Ochoa-Canela: | Yup and it's a 45 |
| Ochoa-Canela: | Just need a driver cuz for real I don't fit |

This conversation is evidence of the relationship between Edgar, Richard, Ochoa-Canela, and Mireles. The government anticipates that its drug-trafficking expert will testify guns are used to protect drug dealers, their drugs, and their money.

### d. Communications on March 16, 2016, between Edgar and Richard Roque

On March 16, 2016, Edgar had an Instagram Direct chat with Richard Roque, Mireles, Phillip Diaz, Ochoa-Canela, Ramiro Roque, and others. During the conversation, the following communications were sent:

| | |
|---|---|
| Richard: | Cebo Ajax is off? |
| Richard: | Smh [Se me hace.] [I believe.] |
| Ramiro: | *LIKE* |
| Edgar: | Maybe |
| Richard: | What you mean maybe you took the ones they where in their |
| Ochoa-Canela: | I'm here |
| Edgar: | I took like 2 points |
| Edgar: | Why what they told u |
| Edgar: | I weighed it, it was 28.2. |
| Richard: | You took the two bags |
| Edgar: | There was only 1 |
| Richard: | There were 3 |

| | |
|---|---|
| Edgar: | I only took 1. |
| Richard: | You took 2 I believe |
| Edgar: | No for real |
| Edgar: | Wtf |
| Edgar: | Call me |

The government anticipates that its drug-trafficking expert will testify that narcotics often are sold in ounce quantities, among other quantities, and one ounce equals about 28.3 grams.

### e. Conversations with Calvin Avendano in April and May 2016, and Edgar's Trip to Meet Avendano in Culiacán, Mexico

On April 25, 2016 (TP2 Sessions 27, 28, 29, 30, 32, 33, 34, 36, and 38), Edgar Roque, who was using telephone number (310) 346–6102 ("Target Phone 2"), had text message communications with Calvin Avendano. In these communications, the following was written:

| | |
|---|---|
| Avendano: | Hey, my boy, did they get rid of the t-shirts[9] |
| Edgar: | I'm going to go for that after my daughter's game. I'll Text you when I have it, so that you can pass me a number |
| Avendano: | Ok foshow hey dude just with the truck that's the low |
| Edgar: | Talking to him but what he is saying he's good for the long runs |

---

[9]     The government anticipates that its drug-trafficking expert witness will testify that "t-shirts" is a common term used by narcotics traffickers to refer to quantities of cocaine.

> Avendano: Was up i my puto 20 in mjs city n lebrons city[.][10] How much would you pay for it over there dude?
>
> Edgar: What do you mean? Which buddy? lol if you arrive there with them
>
> Edgar: I have to call or talk arrive there with the bulls I can move around easily over there
>
> Avendano: Yes there with the bulls
>
> Edgar: I have to call

On or about April 27, 2016 (TP2 Sessions 196, 199, 200, 202, 255, 259, 260, 261, 262, 263, 264, 266, and 267), Edgar, who was using Target Phone 2, had additional text message communications with Avendano. In these communications, the following was written:

> Avendano: What's up, my boy? What's good? Monday already passed and nothing dude.
>
> Avendano: Hey dude do me a favor answer dude. It's already been 2 weeks and nothing. These people
>
> Avendano: . . . . are hot now we went too far now for real dude 2 fucking bricks for two fucking weeks is a lot we've gone too far for real[11]
>
> Edgar: Yea I know my boii my bad tell your cousin to drop by at 3 so I can give him that over there at work

Later on or about April 27, 2016, Edgar Roque's text message communications with Avendano continued:

---

[10] The government plans to introduce evidence to show that "MJ," or Michel Jordan, played basketball for the Chicago Bulls, while in 2016, "lebron" played basketball for the Cleveland Cavaliers.

[11] The government anticipates that its drug-trafficking expert witness will testify that a "brick" is a common term used by narcotics traffickers to refer to kilogram quantities of narcotics.

| | |
|---|---|
| Avendano: | Hey my boy how much did you give my cousin |
| Edgar: | It's 21500 he agreed to bring me the rest if he doesn't give me the rest later on I'll give you one of those in addition to the remainder |
| Edgar: | And he can just pay me |
| Avendano: | Yeah dude the problem is these guys want the paper or what we gave you[12] |
| Edgar: | Yea I got u don't trip. |
| Edgar: | As soon as I do this for you so I can go talk to you |
| Avendano: | Ok foshow |
| Avendano: | Yea men we need to talk got good projects i know we could do something |
| Edgar: | Yea I know if I had known about this guy I wouldn't have done anything |

On May 2, 2016, at approximately 7:38 p.m. (TP2 Session 837), Edgar Roque, who was using Target Phone 2, had a telephone conversation with Avendano. During the conversation, Edgar and Avendano said the following:

| | |
|---|---|
| Edgar: | What's cracking? |
| Avendano: | Nothing. Just lying around here. They are on my ass over here for that money. |
| Edgar: | I know. I know. I was trying to text my boy to see when his are going to arrive so that he can lend me one so that I could pay it back. |
| Avendano: | Right on. Right on. Cool 'cause I . . . . |
| Edgar: | What's up dude, what is there? |

---

[12]     The government anticipates that its drug-trafficking expert witness will testify that "paper" is a common term used by narcotics traffickers to refer to money.

| | |
|---|---|
| Avendano: | I don't know what the fuck. . . . That dick is just feeding me fucking lies. Are you slow or what's up? Or are you at a standstill? |
| Edgar: | No. Well I'm trying to clear you out. That's what I'm trying to do. If not, then I'll give you my Jeep. I'm not going to end on a bad note because of another dude. |
| Avendano: | No, none of that. The point of this is to work. |
| Edgar: | Yeah. Yeah. You understand me? I was just trying to clear you out, you know? How can I ask you for something? You're going to say, "You haven't paid me the other one, and you're asking for more!" Am I wrong? |
| Avendano: | Yes. Well, that's what the brothers were telling me, "What's up with that dude? Why doesn't he come by over here?" And [*unintelligible*] now. Do you understand me? |
| Edgar: | Yeah. |

Also during this telephone call, Edgar and Avendano said the following:

| | |
|---|---|
| Avendano: | [*Unintelligible*] it's very strange that this dude is slow or [*unintelligible*] is at a standstill. |
| Edgar: | No, I haven't done shit. I'm just trying to clear you out before I could even ask for something. |
| Avendano: | Yeah. Because this dude [*unintelligible*] I said that for this [*unintelligible*] but he is going to drive the 24 flat, dude. [*unintelligible*] there. |
| Edgar: | Uh huh. And what's up with that up there? For Chi? |
| Avendano: | Well, I have some there . . . . |
| Edgar: | I'm ready. Honestly, over there has always been my shit. Here, it's only when something comes up but over there . . . . |

| | |
|---|---|
| Avendano: | Either way, the truck is ready already. I have it ready, but what happened is that since I had it at a standstill, the driver became impatient, and now I'm struggling to look for [*unintelligible*] dude. But that shit is ready, dude. On top of that, I have one that's heading out tomorrow, dude. I'll see how I do it, [*unintelligible*]. But God willing, we will be there with Michael Jordan and all of those places. |
| Edgar: | Shit, if you were to tell me I would jump on the road right now. |
| Avendano: | Yeah. Does "Machin" come out over there dude? |
| Edgar: | Yeah. That's where I always, I only worked over there dude. You understand? Do you remember when I saw you guys over there where you are from in Mex, that's why I had gone over there but everybody's calling me. It's a whole different story from here, you know. Like the profit and everything. It's better for me over there, too. |

A short time later during this same telephone call, Edgar and Avendano said the following:

| | |
|---|---|
| Avendano: | That's how it is. I was going to ask, do you still want to that shit in Ohio with your buddy? |
| Edgar: | Yeah, he's still waiting. It's just that I don't know what's up with you. You didn't say anything to me so I thought you must have gotten worried about that. I told him too, 'This fucking 'Lentes [glasses]' is the name of my cousin, dude. This fucking cousin has me in debt over here. |
| Avendano: | I have six of those at hand over there, dude. But I would like them to try them out before they take them. |
| Edgar: | Uh huh. That shit is easy. I could just tell this guy to come here. If you want, tomorrow he could bring a sample of each one because we are going to close already. |
| Avendano: | Right on. |

Also during this telephone call, Edgar and Avendano said the following:

Edgar: That one is good. He's good, too. Since he told me too, you understand? Or come here to TJ so that I can gossip with you.

Avendano: Fuck, that's tough. Come over here, or if not, then to Perla, dude.

Edgar: When are you going to go over there? It's 'cause I wouldn't want to [*unintelligible*].

Avendano: [*Unintelligible*] one of my sons wants me to go with him already. But honestly, [*unintelligible*] happy in my land, son.

Edgar: Of course. Of course. The thing is that you're in [*unintelligible*].

Avendano: There you go. The [*unintelligible*] first.

Edgar: It's fine.

Avendano: But God willing, I will go over there in a couple of days and if you want you can head over there, and we will have a good talk.

The telephone call continued between Edgar Roque and Avendano:

Edgar: What can you do there with my buddy? If you want, I can go and sit down with you so that you can see that there's no problem with that shit, dude.

Avendano: No, I know that there isn't a problem. I already know. You know what I mean? I'll sit there with you so we can do something, too.

Edgar: I'm not doing shit, straight up. Honestly, I'm not doing good and [*unintelligible*] ask me the 10 right now, but I need to know for sure that they got the motherfucking money. You know what I mean? If my own cousin is fucking me over, imagine what someone else. And I don't feel it, like fuck it. On other occasions, well you have to respond to be like, "Fuck this. I'll send someone."

Avendano: That's true . . . .

| | |
|---|---|
| Edgar: | But right now, winning 300 bucks, I don't want to fuck up. That's why I'm saying, I know what's up in Chicago. We running this show because it's like you to me right now. I'm a first hander. So it's not a problem sending to nobody. |
| Avendano: | That's how it is . . . . |

A short time later during this same telephone call, Edgar and Avendano said the following:

| | |
|---|---|
| Edgar: | If you were to tell me about over there, I'll leave tonight. Straight up. |
| Avendano: | Well, it will happen. It will happen. It's just that we are waiting for that fucking driver right now. Just in case, I have a "ventilator" [twenty] to send it over there. |
| Edgar: | And that shit can get there in a weekend. Once it gets there . . . . I just need to talk to you so that I can go over there and open up an office and that's it. Because I don't have a house or anything over there anymore, but all the homies are over there. |
| Avendano: | No, we'll open it. |
| Edgar: | It's like me coming to LA, and I already know where to go. Like, "Hey, let me borrow a car for a week or so." Meanwhile I buy a car or help me look for a house, and it can be done right away. |
| Avendano: | Right on. Yeah, well if you want that for your buddy as well, if you have faith in him then let me know and we'll get it running. |
| Edgar: | Well, that's a yes. That's why I was saying you and him. I wish I could [*unintelligible*] I want to go on one. You know what I mean? |
| Avendano: | Right on! |

The telephone call continued between Edgar Roque and Avendano:

| | |
|---|---|
| Edgar: | But I don't want to be on a bad note with you dude. That's why I'm telling you, if you want, we could do . . . . I'll call him right now and I'll sit down with him and talk to him and see what we could do. And like I said, I'll go there and sit there with you so that I could make something, too. |
| Avendano: | Nah, don't trip. Either way, we'll do it. That's the least worry. If you want, do you want me to send you that so that you could take that photo of the girl so that [*unintelligible*] to see if it's good? |
| Edgar: | If they're all the same, just tell him to come early tomorrow. Because I'm coming to the shop early because my dad isn't here. He's in Mex and they have me working very hard here. |
| Avendano: | Right on, right on. |
| Edgar: | I'm right here and they're telling me, "Hey, this . . . ." And I'm just like, "Fuck, man! . . ." It's been a while, you know I haven't been kicking it right here, but fuck it, I need to do what I need to do. |
| Avendano: | If you want we'll do it, dude. I'll hit you up tomorrow to give you that. |
| Edgar: | OK. So I'll talk to my buddy right now and see what he tells me. |
| Avendano: | Sounds good then. |
| Edgar: | All right. |

Later on May 2, 2016, at approximately 8:17 p.m. (TP2 Session 840), Edgar Roque, who was using Target Phone 2, had another telephone conversation with Avendano. During the conversation, Edgar and Avendano said the following:

| | |
|---|---|
| Avendano: | Hey dude, my girl is asking when you can come over here so that you can have a good talk here before we do all of that. |
| Edgar: | I don't know. You tell me. |

Avendano:      Just one day . . . .

Edgar:         I'll tell my brother . . . . Let me talk to my brother and see if he can stay here at the shop since my dad's not here.

Avendano:      Right on.

Edgar:         I'll just go over there, any day. Fuck it. [*unintelligible*] whatever you guys want to ask and I could make it happen.

Avendano:      Look, it's because we just want you to come talk here with us so that we could tell the boss about how all the steps will be taken. Do you understand me?

Edgar:         Yeah, 'cause I could tell you that I already know. It's not like it's the first time I go there. Do you understand me? . . . I could let you guys know what really . . . . How to help you guys out, too. You know what I mean?

Avendano:      Right on, right on.

Edgar:         Because there's a lot of places where one . . . . Like if you have never gone over there, you might say, "Right there, it seems cool dog." But sometimes it's not cool. Because that city is very active. Very active. It's full of "feos" [ugly men], dude.

Avendano:      Right. Right. That's why I'm asking you when can you come over here just for a day and then you can hurry back, just so that we can be good.

Edgar:         All right. What's today? How does Wednesday sound?

Avendano:      Right on, right on. Just tell me when and I'll go pick you up.

Edgar:         All right well to be safe, Wednesday. I'm just going to go and tell my brother to stay here Wednesday and I'll stay over there with you all one or two days.

Avendano:      Right on. So when?

Edgar:         If you need me there the whole week, I'll stay there the whole week.

51

| | |
|---|---|
| Avendano: | The point is to work, and that you come and talk, and to go back. |
| Edgar: | [*Unintelligible*] that's what I'm talking about. I'm down with that. |
| Avendano: | Yeah? But we got the thing ready, my nigga. It's just a matter of you giving us a hand there, dude. |
| Edgar: | All right. 'Cause yeah there's no problem in getting over there and open an office. That's no problem, but honestly, I do want to talk with you guys, too. |
| Avendano: | Right on. So when can you come by? |
| Edgar: | I'm telling you Wednesday. |
| Avendano: | Wednesday? All right. Sounds good then. I'll pick you up then. Don't trip. |
| Edgar: | All right. |
| Avendano: | All right [*unintelligible*], be careful. |

On May 3, 2016, Edgar Roque, who was using his Instagram account, had

Instagram Direct communications with Mireles, Phillip Diaz, Ochoa-Canela, Richard

Roque, and others. At approximately 12:12 a.m., ROQUE sent the following photograph:



On May 8, 2016 (TP2 Session 1588), Edgar Roque, who was using Target Phone 2, sent a text message to Avendano. In the message, Edgar wrote, "[T]omorrow I am going to go over there to you. I get there 10:05 pm." Also on May 8, 2016, Edgar Roque, who was using his Instagram account, had Instagram Direct communications with Mireles, Phillip Diaz, Ochoa-Canela, Richard Roque, and others. During the communications, Edgar wrote, "I need a ride tmrw what up[?]" On May 9, 2016, Edgar Roque, who was using his Instagram account, had Instagram communications with Mireles, Phillip Diaz, Ochoa-Canela, Richard Roque, Ramiro Roque, and others. During the communications, the following was written:

Edgar:          I need a ride to tj

Edgar:          What up

Edgar:



**Welcome aboard!**

My reservation code is: **JYKF2N**

Flight information

| Date | Departure / Return | Route | Flight | Customers |
|---|---|---|---|---|
| Monday, May 9 | 06:57 P.M. 10:05 P.M. | Tijuana to Culiacan | Y4 418 | Edgar Roque |

**Total: $223.34** USD

⚠ For every flight with the USA as origin or destination, booked with more than 7 days ahead of departure, during the first 24 hours after your reservation has been paid, penalty fees for changes and cancellations do not apply.
**Please note:** fare difference applies for any itinerary change.

My fare includes: 🧳 One checked bag of maximum 55 lb. It must not exceed 62.2 linear inches (width+ height+ depth). 🧳 Maximum 2 pieces on board of maximum 41.2 linear inches (9.8"x15.7"x15.7").

Additional baggage fees at airport:

| Baggage | Price | Baggage | Price |
|---|---|---|---|

| | |
|---|---|
| Ramiro: | Clean |
| Edgar: | I need a ride |
| Ramiro: | Let me tell my father-in-law |
| Ramiro: | What time? 3? |
| Ramiro: | U got ur passport??? |
| Richard: | I know a guy that could take you on a Benz for $200 |
| Ochoa-Canela: | 160 in a Honda |
| Ramiro: | Cool niggas |
| Ramiro: | Take him tee[13] |

---

[13]    "Tee" was a nickname for Ochoa-Canela.

In this exchange, one in which Mireles was sent all these communications, Edgar explained that he needed a ride to Tijuana, Mexico, and that he had booked a flight from Tijuana to Culiacán, Mexico, for later that same day. Mireles was not "merely" present—he was not a bystander—when Edgar sent these communications. Rather, Mireles was a trusted part of this conspiracy whom Edgar told the plans for Edgar to meet in Mexico with the organization's cartel-level supplier.

Location data from Edgar Roque's phone, Target Phone 2, showed that on May 11, 2016, at approximately 6:45 p.m., Target Phone 2 was in the San Diego, California, area, near the Mexico border. At approximately 11:35 p.m., Edgar posted the following photograph on the main page of his Instagram account:



On May 12, 2016, Edgar Roque, who was using his Instagram account, sent the following photograph of the Culiacán, Mexico, airport to Mireles, Richard Roque, Ramiro Roque, Phillip Diaz, and Ochoa-Canela:



Additionally, border-crossing records show that on May 13, 2016, Edgar Roque entered the United States from Mexico in a vehicle with California license plate 6RTV706 at a land bridge at San Ysidro, California.

Altogether, the intercepted communications with Avendano over Target Phone 2, the intercepted communications over Edgar's Instagram account, location data from Target Phone 2, and the photos that Edgar shared show that Edgar Roque traveled to Culiacán, Mexico, in May 2016 to meet with Avendano and discuss the shipment of narcotics by Avendano to Edgar and his coconspirators for delivery in locations including the Chicago area.

### f. Communications on July 15, 2016

On July 15, 2016, Edgar had an Instagram Direct chat with Mireles, Richard Roque, Ramiro Roque, Phillip Diaz, Ochoa-Canela, and José Octavio Flores. During the conversation, the following communications were sent:

Ochoa-Canela:



| | |
|---|---|
| Ochoa-Canela: | 1k |
| Ramiro: | For real |
| Mireles: | I got 500 |
| Edgar: | I ain't got nada |

### g. Communications on August 7, 2016

On August 7, 2016, Edgar had an Instagram Direct chat with Mireles, Richard Roque, Ramiro Roque, Phillip Diaz, Ochoa-Canela, and Octavio Flores. During the conversation, the following communications were sent:

Edgar:



Ramiro:



Ochoa-Canela:  Wmo FF

Ramiro:



### 5. Border-Crossing Records

The government anticipates introducing border-crossing records for various coconspirators. Although the United States does not keep records of individuals leaving the country, the records show the coconspirators entering at various borders from Mexico. Among other entries, these records show the following:

- *May 4, 2014*: Richard Roque and José Mireles entered the United States in a vehicle with California license plate 8N06480 at a land bridge at Otay Mesa, California.

- *October 23, 2014*: Edgar Roque and José Mireles entered the United States in a vehicle with California license plate 6TFU217 at a land bridge at Calexico, California.

- *May 13, 2016*: Edgar Roque and another individual entered the United States in a vehicle with California license plate 6RTV706 at a land bridge at San Ysidro, California.

As discussed above, Edgar Roque's entry on May 13, 2016, was in connection with his trip to meet with Avendano to discuss narcotics trafficking. More generally, these frequent crossings among the various members of the conspiracy are indicative

of meetings in Mexico to discuss drug trafficking, especially given that these individuals all lived in the Los Angeles area, well over 100 miles from the points-of-entry at San Ysidro and Otay Mesa, and over 200 miles from the Calexico point-of-entry.

### 6.    Bank Records

Mireles had an account bearing number ending in 2095 at Bank of America. Records from Bank of America show the following transactions, among others:

| Date | Type | Bank Location | Amount |
| --- | --- | --- | --- |
| 12/26/2014 | Withdrawal | California | $7,944 |
| 02/20/2015 | Deposit | 52nd and Pulaski, Illinois | $1,300 |
| 03/11/2015 | Deposit | Paramount, California | $1,500 |
| 04/20/2015 | Deposit | Poughkeepsie, New York | $3,950 |
| 04/21/2015 | Withdrawal | California | $3,650 |
| 04/23/2015 | Deposit | South Yarmouth, Massachusetts | $6,000 |
| 04/28/2015 | Deposit | Bronx, New York | $3,000 |
| 04/29/2015 | Withdrawal | California | $4,600 |
| 04/30/015 | Withdrawal | California | $2,958 |
| 05/04/2015 | Deposit | Manhattan, New York | $9,000 |
| 05/06/2015 | Withdrawal | California | $8,700 |
| 05/13/2016 | Deposit | Garfield Ridge, Illinois | $4,000 |
| 05/26/2015 | Deposit | Ashland and Roosevelt, Illinois | $4,500 |
| 05/26/2015 | Withdrawal | California | $2,500 |
| 06/01/2015 | Deposit | South Dennis, Massachusetts | $8,000 |
| 06/03/2015 | Withdrawal | California | $7,000 |

These bank records further show that Mireles was not merely present among his friends while they committed drug-trafficking crimes without him. The

government anticipates that a bank representative will testify that, to make each of the cash withdrawals identified in the table above, the accountholder had to present photo identification to a teller at a bank branch. Given that Mireles was the only signatory on this account, this all means that Mireles himself went to Bank of America bank branches in California and withdrew all of this cash. The timing of deposits around the country followed by quick withdrawals of nearly all of the deposited funds in California by Mireles provide proof that the deposited money came from ill-gotten gains and that Mireles used his bank account to funnel those gains back to individuals in Los Angeles. In light of the other evidence the government plans to introduce at trial, the clear inference that the jury will be able to draw is that the illicit conduct that produced the proceeds was drug trafficking. The bank records thus provide further proof of Mireles's active participation in the charged drug-trafficking conspiracy.

### D.    Coconspirator Statements

The statements between the coconspirators in furtherance of the charged drug-trafficking conspiracy fall into numerous categories, all concerning subjects integral to the conspiracy. These statements—which will establish the information flow between coconspirator intended to help each perform his role—will be introduced through the testimony of cooperating sources, and through the presentation of the government's search warrant and wiretap evidence.

The coconspirator statements offered at trial will concern the subjects listed below, and include, but are not limited to, the coconspirator statement discussed above[14]:

The government intends to call Edgar Roque, Donald Williams, and possibly others. They will likely testify about conversations they had with other members of the conspiracy. For instance, Roque will testify about regular conversations he had while in Los Angeles with co-conspirators regarding the drug conspiracy, including co-conspirators' confirming for Roque that narcotics-laden packages shipped via Amtrak Express had been received in Chicago, that the drugs inside the packages had been successfully distributed, and that narcotics proceeds associated with the sale of the drugs had been collected and laundered. Williams, meanwhile, is expected to testify about purchasing wholesale quantities of narcotics from Edgar Roque, about brokering deals to others, and about exchanging narcotics for cash on multiple occasions with Mireles in connection with deals he arranged with Edgar.

The government further plans to introduce numerous communications among the coconspirators from 2015 and 2016. These statements were obtained through search warrants on the coconspirators' various Instagram accounts as well as cell

---

[14] Given the extent and number of such statements in this case, the government is not detailing each and every proposed coconspirator statement of each witness or document, but rather is providing this general framework for the categories of statements. Further, by attributing statements to particular witnesses in this *Santiago* proffer, the government is not committing to call each of the witnesses for each of the statements attributed. Of course, the government is committed to establishing the *Bourjaily* predicates at trial and the ultimate admissibility of coconspirator statements is governed by the trial evidence.

phones used by the coconspirators. The government also obtained additional statements through the use of Title III wiretaps on Edgar Roque's and Omar Ramirez's Instagram accounts, two of Edgar Roque's telephones, and several BlackBerry Messenger devices. These communications include, but are not limited to the statements detailed above concerning: identifying other members of the conspiracy and their roles, identifying the structure of the conspiracy and responsibilities of the conspirators, and discussion of coconspirators' criminal activities and the roles of participants in the conspiracy's illegal activities. The communications also include statements to meet to build trust among coconspirators; to plan drug deliveries; concerning negotiating quantities and prices; involving logistics (such as when and where to meet, and who will participate); involving the progress of a particular drug delivery (such as Mendoza's ledger in October 2015); to inform coconspirators about the presence of law enforcement.

The specific statements discussed above are representative samples of the types of statements that fall into these categories and are admissible as coconspirator statements. As is evident from the categories' description, all such statements made by coconspirators furthered the conspiracy. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).

## II. Admission of Evidence under Rule 404(b)

The government also seeks permission to introduce evidence concerning Mireles's failure to file tax returns in 2014 and 2015 as well as evidence of his flight

from law enforcement officers following his arrest in 2016. That evidence is admissible under Rules 401, 403, and 404(b).

### A. Evidence the Government Seeks to Admit

#### 1. Tax Records

Per orders entered by Chief Judge Rubén Castillo, the government obtained tax returns and return information for a number of individuals under investigation in this case, including Mireles. On June 14, 2017, this Court entered an order permitting the government to produce Mireles's tax return information to Mireles. R. 235.

The tax return information obtained from the IRS and produced in accordance with this Court's order show that Mireles did not file tax returns for tax years 2013, 2014, or 2015.

#### 2. Mireles's Flight

The government arrested a number of individuals charged in this case on October 25, 2016. Among the individuals arrested were Mireles and Edgar Roque, who were arrested by the same team of law enforcement officers in the morning of October 25. Exhibit C contains a report of the arrest. As discussed in the report, following Mireles's arrest, he escaped from custody and fled.

More specifically, early in the morning on October 25, DEA Special Agent Nina Goteva as well as law enforcement officers from the DEA in Los Angeles and the Hawthorne Police Department assembled to arrest Edgar Roque and Mireles. The team went first to Edgar's residence where they announced themselves and arrested Edgar without incident. The team then moved to Mireles's residence. At about

6:30 a.m., the team arrived at Mireles's residence and took him into custody. The team then drove in three vehicles back to DEA's facilities in Los Angeles with Edgar in one of the vehicles and Mireles in another. Both individuals were in cuffs with their hands behind their backs for the trip to DEA's offices.

While headed northbound on the 710 Freeway, the caravan came to a stop while in heavy morning traffic. Mireles—with his hands still cuffed behind his back—then opened the door to the vehicle in which he was being transported, jumped out of the vehicle, and began to run away from the law enforcement officers southbound on the 710 Freeway. Mireles then jumped over the center dividing wall of the highway and ran across southbound traffic to the other side of the highway. Mireles found a maintenance vehicle with its keys nearby parked by the southbound side of the 710 Freeway, got into the vehicle, and drove away. The law enforcement officers transporting Mireles and Edgar were not able to follow Mireles because their vehicles were stuck on the northbound side of the highway and because they were still transporting Edgar to the DEA. As a result, Mireles successfully fled and remained a fugitive until May 2018—a period of about 18 months.

### B. The Rules of Evidence Permit Admission of Mireles's Acts

Mireles's failure to file tax returns for 2014 and 2015, and his flight from prosecution in October 2016, are admissible under Rule 404(b)(2). According to that rule, evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But, such evidence is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014) (en banc). In *Gomez*, the Seventh Circuit explained that Rule 404(b) requires a "chain of reasoning that supports [a] non-propensity purpose for admitting the evidence. . . . [T]he rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Gomez*, 763 F.3d at 856; *see also United States v. Lawson*, 776 F.3d 519, 521–22 (7th Cir. 2015).

### 1. Failure to File Tax Returns

The Seventh Circuit regularly has held that a failure to file tax returns is admissible evidence under Rule 404(b). *E.g.*, *United States v. Mendoza*, 382 F. App'x 507, 511 (7th Cir. 2010); *United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir. 1990); *see also United States v. Benalcazar*, No. 09 CR 144, 2011 WL 4553027, at *15 (N.D. Ill. Sept. 29, 2011) (explaining that "the failure to document his income in tax returns during the years that he participated in the scheme is relevant to his desire to conceal any ill-gotten profits as well as his knowledge of the scheme's illegality").

This evidence remains admissible even under the rules-based approach to Rule 404(b) announced in *Gomez*. As the court explained in *Briscoe*, when a defendant in a drug conspiracy had substantial unreported income in a tax year and failed to file tax returns in that year, the evidence is relevant because "a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns," establish "that the defendant lacked a legitimate source of income." *Briscoe*, 896 F.2d at 1500. From there, a jury can infer that "the reason for the failure to report this income is due to the defendant's participation in illegal activities." *Id.*

66

Such use would be to show defendant's knowledge of the narcotics conspiracy in which he was charged with participating. That is a permissible use and not merely to show that the defendant had a character to commit crime and thus must have committed the charged crime in this case (*i.e.*, propensity). And, the probative value of the evidence—proving defendant's knowledge—is not outweighed by any unfair prejudice.

That is precisely the situation in this case. Between February and June 2015, approximately $41,250 was deposited into Mireles's Bank of America account. The funds were deposited in Illinois, California, New York, and Massachusetts. Mireles withdrew about $29,408 of those funds that occurred in rapid succession following each deposit. (Records also show that Mireles withdrew an additional $7,944 in December 2014.) The timing of the deposits and withdrawals, the locations of the deposits and the fact that Mireles made all withdrawals in California, and the fact that Mireles failed to file tax returns reporting these funds to the IRS all show that these funds did not come from a legitimate source of income. From there, a jury reasonably could infer that the funds instead came from the conspiracy drug-trafficking activities, and that Mireles's withdrawals of the funds showed Mireles's active participation in the conspiracy. In these ways, the fact that Mireles failed to file tax returns is relevant to showing that Mireles committed the conspiracy crime with which he is charged. This purpose is not in any way a propensity argument. And, the evidence is highly probative, undermining any potential claim that the Court should bar the evidence under Rule 403.

### 2. Flight

Evidence of flight is admissible to show consciousness of guilt and guilt itself. *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998); *see also, e.g.*, *United States v. Perez-Martinez*, 746 F. App'x 468, 475 (6th Cir. 2018), cert. denied, 139 S. Ct. 849 (2019) ("Flight evidence comes in as an admission of guilt by conduct . . . ."); *United States v. Fox*, 627 F. App'x 608, 609 (9th Cir. 2015).

Here, Mireles unquestionably knew that he was under arrest and in the custody of law enforcement at the time of his escape: Mireles was arrested at his home after the arresting officers announced themselves at his front door, he was placed in handcuffs and placed in the back of a law enforcement vehicle, and when he escaped from the vehicle, law enforcement officers chased him. In light of the facts of Mireles's escape from custody while on his way to the DEA's offices in Los Angeles, and while his coconspirator (Edgar Roque) was seated in another vehicle of the same caravan on the way to the DEA, the jury reasonably can infer that Mireles took this extreme step of escaping (and placing his safety at significant risk) because he knew he had committed significant drug-trafficking crimes and was about to face a lengthy term of imprisonment as a result.

As such, Mireles's flight amounts to an admission of guilt by Mireles that he committed the drug conspiracy crime with which he is charged. That makes this evidence relevant and highly probative. Moreover, this is a basis for admission unrelated to showing conformity with a character trait—this is not a propensity argument—meaning that Rule 404(b)(1) does not prohibit admission.

### III. Conclusion

The above is an outline of the evidence that the government intends to introduce to establish that the charged drug-trafficking and money-laundering conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,
JOHN R. LAUSCH, JR.
United States Attorney

By:     *s/ Sean Franzblau*
SEAN FRANZBLAU
JOHN MITCHELL
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353–5300