UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 15 CR 485-9 |
| v. ) | |
| ) | Hon. Virginia M. Kendall |
| JOSE MIRELES, JR. ) | |
| ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully submits the Government's Sentencing Memorandum, and asks this Court to sentence the defendant to 342 months' imprisonment and a 5-year term of supervised release, as recommended by the Probation Officer.

**I.  Background**

For approximately two years, defendant participated in a massive drug distribution and money laundering conspiracy led by Edgar Roque. During his participation in the conspiracy, defendant regularly traveled to Chicago to receive narcotics-laden Amtrak Express packages that Roque and his other workers shipped from Los Angeles, distribute the narcotics to Chicago-based customers, and collect and launder the drug proceeds. Defendant is personally responsible for the distribution of hundreds of kilograms of cocaine and dozens of kilograms of heroin, and the collection and/or laundering of millions of dollars in cash proceeds.

Defendant was on of Edgar Roque's most trusted workers. In October 2014,

Roque brought defendant to Mexico to meet with Roque's Sinaloa Cartel suppliers. During the trip, defendant witnessed the vicious beating and kidnapping of a fellow co-conspirator by a cartel leader and his gunmen. Undeterred, defendant returned to Chicago just days later to continue his involvement in the conspiracy, which included attempting to facilitate the receipt of a 10-kilogram heroin shipment on November 6, 2014 which was ultimately seized by law enforcement.

Defendant's role in the conspiracy was not limited to moving massive quantities of drugs and drug money. In June 2015, defendant attempted to obtain six Glock-19 firearms for Edgar Roque. The associated wire intercepts indicate that this incident was not defendant's first time obtaining/attempting to obtain firearms. *See* G.V. Attachment 2, 5: "Yo . . . Ur boy can still get toys?").

After defendant was arrested at his home in October 2016, he escaped custody while being transported to the federal building in Los Angeles. During his escape, defendant ran across multiple lanes of traffic on a busy expressway and later stole a vehicle from an innocent bystander and drove it at a high rate of speed directly toward DEA Special Agent Nina Goteva, who was frightened for her life. *See* Ex. A (Agent Goteva's trial testimony regarding defendant's escape), 34-35. Defendant swerved the vehicle out of Agent Goteva's path at the last minute, as Agent Goteva was forced to open fire on defendant to protect herself and the public from the extraordinarily dangerous situation defendant created. Defendant managed to successfully flee the scene and remained a fugitive for over 15 months.

## II. The Government's Position on Sentencing

The district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). The sentence imposed must be "sufficient, but not greater than necessary," to comply with the purposes of sentencing provided under 18 U.S.C. § 3553(a)(2).

A. <u>The PSR</u>

The government has no factual objections to the PSR and agrees with the Probation Officer's guidelines calculation. Defendant is a total offense level of 40 and a criminal history category II, leading to an advisory guidelines range of 324-405 months.

With respect to drug quantity, the Government's Version and the PSR's findings are based on the number of Amtrak Express packages sent during defendant's involvement in the conspiracy (late November 2013 to June 2015), which was at least 44 packages, multiplied by 10 kilograms of cocaine, which Edgar Roque testified at trial was the minimum quantity contained in each Amtrak Express package. After reviewing this Court's quantity analyses in prior sentencings in this case, the government wishes to revise its approach to drug quantity (though the revised approach yields the same result under the guidelines).

Rather than calculating quantity based on all Amtrak Express packages shipped during defendant's involvement in the conspiracy, the government

3

recommends the Court base its quantity findings on the number of Amtrak Express packages received in Chicago during defendant's involvement in the conspiracy *while defendant was in Chicago.* This subgroup of packages was more obviously foreseeable to defendant, as Roque testified at length at trial about how defendant regularly assisted with collecting, transporting, and distributing the narcotics shipped to Chicago during defendant's approximately 10 trips there (regardless of whether the packages were addressed to defendant), and that testimony was corroborated by substantial independent evidence.

The flight records introduced at trial (Government Exhibit 15), which were corroborated in significant respects by Roque's testimony, toll records, bank records, and the Amtrak Express records that listed defendant as the recipient of packages at Chicago's Union Station, establish that defendant was in Chicago for purposes of the conspiracy at the following times:

- Unknown arrival date (though trial evidence showed Mireles received a package at Chicago's Union Station on November 25, 2013) to December 10, 2013;

- January 28, 2014 to March 10, 2014;

- May 17, 2014 to May 19, 2014;

- October 28, 2014 to unknown departure date (through trial testimony showed Mireles was in Chicago through at least November 6, 2014);

- December 20, 2014 to December 22, 2014;

- February 9, 2015 to February 24, 2015;

- June 22, 2015 to July 1, 2015.

Based on the government's summary of Amtrak Express records, introduced

4

at trial as Exhibit 3, a total of 13 packages were received in Chicago during these time periods. These 13 packages included the November 6, 2014 package, which, as proved at trial, was seized by law enforcement and found to contain 10 kilograms of heroin. If 10 kilograms of cocaine are ascribed to the other 12 packages received in Chicago while defendant was there, the drug quantity calculation looks as follows:

- 12 packages x 10 kilograms of cocaine = 120 kilos of cocaine = 24,000 kilograms of converted drug weight.
- 1 package x 10 kilos of heroin = 10 kilos of heroin = 10,000 kilograms of converted drug weight.
- = 34,000 kilograms of converted drug weight = Base Offense Level of 36.

The above estimate is still highly conservative. For example, it does not include the approximately 10 kilograms of cocaine that defendant helped to hide and later distribute to Donald Williams during his June 2015 trip to Chicago (which cocaine Ivan Diaz received at Union Station on June 20, 2015). It also does not include any heroin other than the heroin seized on November 6, 2015.

With respect to Probation Officer's application of the 2-level § 3C1.2 obstruction adjustment for recklessly creating a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, Agent Goteva's trial testimony regarding defendant's escape is a plainly sufficient basis for the adjustment, particularly the portion regarding defendant's stealing a white pickup truck and driving it directly at Agent Goteva at a high rate of speed

5

such that Agent Goteva felt "fear" as the vehicle got "close" to hitting her. Ex. A, 34-35. *See, e.g., See United States v. White*, 903 F.2d 457, 459-60 (7th Cir. 1990) (flight coupled with "almost mortal" circumstances triggers the 3C1.2 adjustment).

As the Court knows, although the parties agreed to keep this testimony out at trial, Agent Goteva was forced to open fire on the defendant in an effort to neutralize the threat he posed to Agent Goteva and the public. Ex. A, 34-35. As the Probation Officer correctly noted, forcing Agent Goteva to open fire on him in a residential area provides a separate basis for application of the adjustment. *See, e.g., United States v. Atwood*, 761 Fed.Appx. 651, 653 (7th Cir. 2019) (adjustment applied because trooper pulled his own firearm after seeing defendant was carrying a gun and "might have opened fire . . . and hit a third party). Defendant's jumping out of the police vehicle on a busy highway and running across multiple lanes of traffic during morning rush hour also separately triggers the adjustment. *See* Ex. A, 22-25); *Atwood*, 761 Fed.Appx. at 653-54. ("Drivers might have swerved to avoid [the defendant] and hit barriers, other cars, or a pursuing trooper . . [A]lthough fleeing on foot through an open space might not create the requisite substantial risk of injury, [the defendant] ran *across the expressway*"); *see also United States v. Reyes-Oseguera*, 106 F.3d 1481, 1483-84 (9th Cir. 1997) (running on foot across multiple lanes of traffic justifies the § 3C1.2 adjustment).

In short, there can be no serious argument that the § 3C1.2 adjustment does not apply. In fact, although the government is not requesting it, the Court would be on firm ground in applying a greater than two-level adjustment based on defendant's

6

escape given that his *mens rea* during the escape plainly exceeded recklessness and rose to purposefulness. *See* Guideline § 3C1.2 cmt n. 2. ("Where a higher degree [than recklessness] of culpability was involved, an upward departure above the 2-level increase provided in this section may be warranted).

B. <u>The 3553(a) Factors</u>

*Nature and Circumstances of the Offense*

The seriousness of defendant's crimes cannot be overstated. The full extent of the human misery caused by the thousands of kilograms of poisonous narcotics that defendant and his cohorts pumped into our community is incalculable. At sentencing, the Court will not hear from the likely thousands of addicts who ingested this poison, or their family members and friends who suffer quietly, or the community members who are forced to cope with the gun violence and general social decay that inevitably accompanies the narcotics trade. But the victims are out there, and their interests must be vindicated at sentencing.

Defendant's escape from custody and his 15-month fugitive status gives rise to an unusually compelling interest in punishment and promoting respect for the law. These interests, as well as the need for individual deterrence and incapacitation, are further underscored by the continuous, repeat nature of defendant's criminal activity (nearly two years of unbroken narcotics trafficking activity and approximately 10 separate trips to Chicago). Defendant's willingness to assist Edgar Roque with arming himself and Roque's narcotics trafficking associates also highlights defendant's disregard for public safety, which heightens the incapacitation interest.

General deterrence is also a salient concern. U.S.-based wholesale narcotics trafficking organizations such as the Edgar Roque DTO serve as an essential bridge between the Mexican drug cartels and the street-level dealers who sell to the ultimate consumers. Knocking out that wholesale supplier bridge arguably represents law enforcement's best chance at meaningfully disrupting the global narcotics trade, as there are relatively few such organizations (compared to the number of street-level distributors) and they are easier to reach than their suppliers in Mexico. Any U.S.-based person who is considering partnering with the cartels to move their products from Mexico to the streets of this country must know that they will face the severest of consequences. With this sentencing, the Court has a meaningful opportunity to broadcast that message.

### *History and Characteristics of the Defendant*

Roughly three years before joining the Edgar Roque DTO, defendant was convicted of burglary and false imprisonment with violence and sentenced to two years' custody. Defendant's history of violence, and his return to extraordinarily serious criminal conduct shortly after his release from a custodial sentence, further amplify the need for individual deterrence and incapacitation. *See, e.g., United States v. Walker*, 98 F.3d 944, 947 (7th Cir. 1996) ("When a defendant responds to lenient treatment by committing crime as soon as he is released, the implication is that a severe sentence is necessary to prevent him from continuing to engage in criminal activity.")

Defendant's history is devoid of facts that provide mitigating context to his

crimes. Defendant grew up in a stable, one-parent household in which he never wanted for necessities. PSR, ¶ 54. Defendant did not suffer any form of abuse as a child. *Id*. None of defendant's family members abused substances or were involved in the criminal justice system. *Id*. Defendant appears to have begun abusing marijuana as a teenager and was expelled from high school in the 10th Grade. *Id*. at ¶¶ 64, 67. Defendant did not complete high school and does not have a GED. *Id*. at 67. Defendant has no verified prior employment but claims to have worked in construction as an autobody mechanic prior to his arrest. *Id*. at ¶¶ 71-72.

### *Need to Avoid Unwarranted Sentencing Disparities*

Pursuant to 18 U.S.C. § 3553(a)(6), the Court must avoid unwarranted sentencing disparities with similarly situated defendants. Based on his involvement in the conspiracy alone, defendant's culpability is comparable to Gerardo Sanchez (210 months), Omar Ramirez (188 months), and Steven Mendoza (150 months). Like defendant, Sanchez, Ramirez, and Mendoza were among Roque's most active workers who regularly traveled from LA to Chicago for purposes of furthering the conspiracy. Also, like defendant, Sanchez, Ramirez, and Mendoza were involved in the conspiracy for well over one year but did not have supervisory roles. However, defendant's escape from custody, his 15-month fugitive status, and his failure to accept responsibility for his crimes place defendant at a categorically higher level of culpability than these otherwise similarly situated defendants.

This difference in culpability is most directly reflected in the advisory guideline ranges. As explained above, defendant has a total offense level of 40 and a criminal

history category of II (324-405 months). By contrast, Sanchez was a total offense level of 35 and a criminal history category III (210-262 months), R. 508, 18; Ramirez was a total offense level of 35 and a criminal history category II (235-293 months), R. 678, 28; and Mendoza was a total offense level of 33 and a criminal history category of I (135-168 months), R. 679, 29.

Thus, a 342-month sentence would not lead to an unwarranted disparity with Sanchez, Ramirez, or Mendoza. Nor would it lead to an unwarranted disparity with Phillip Diaz (250 months) or Richard Roque (210 months), both of whom were more deeply involved in the conspiracy than defendant (Phillip Diaz and Richard Roque effectively served as Edgar Roque's deputies, and were involved in the conspiracy for substantially longer than defendant). From the government's standpoint, defendant's escape from custody—particularly the threat he created to Agent Goteva's life/physical safety—and his 15-month long status as a fugitive is sufficiently serious to *substantially* more than offset any differences in culpability between defendant, Phillip Diaz, and Richard Roque with respect to the underlying drug conspiracy. Again, the guidelines support the government's position—Richard Roque had a total offense level 37 and a criminal history category of I (235 to 293 months), and Phillip Diaz had a total offense level of 39 and a criminal history category of II (292 to 365 months). *See* R. 676, 5; R. 591, 32.

Additionally, prior to the instant offense, none of the above listed defendants had prior adult felony convictions, whereas defendant had two adult felony convictions (arising from the same incident), one of which was for a crime of violence.

10

Based on the above, it is appropriate for defendant to receive a sentence that is between Edgar Roque (who was sentenced 420 months), the leader of the conspiracy and most culpable defendant, and the next most-culpable tier of defendants, Phillip Diaz and Richard Roque (who were sentenced to 250 and 210 months, respectively). 342 months, which falls in the lower middle section of defendant's advisory guidelines range, is a sufficient but not greater than necessary point at which to land, particularly considering that defendant acted purposefully during his escape (and thus could have been subject to a larger than 2-level adjustment under § 3C1.2), and that the guidelines do not account for: (1) defendant's money laundering activity; and (2) defendant's efforts to purchase 6 Glock firearms for Roque and his drug suppliers.

C. Supervised Release

The government agrees with the Probation Officer's recommendation of a 5-year term of supervised release (the statutory mandatory minimum) with all recommended mandatory, discretionary, and special conditions. Each of the recommended conditions is justified by the 3553(a) factors (including defendant's history of recidivism and substance abuse) and are necessary to facilitate effective supervision and defendant's reentry into society after a lengthy custodial term.

### III. Conclusion

For the reasons set out above, the government respectfully asks this Court to impose a sentence of 342 months' imprisonment and a 5-year period of supervised release with all conditions recommended in the PSR.

                    Respectfully Submitted,

                    JOHN R. LAUSCH, JR.
                    United States Attorney

By:   */s/ Sean J.B. Franzblau*
       Sean J.B. Franzblau
       Assistant United States Attorney